(No. 97165.—)

*In re* APPLICATION OF THE COUNTY COLLEC-
TOR for Judgment and Sale Against Lands and
Lots Returned Delinquent for Nonpayment of
General Taxes and/or Special Assessments for the
Years 1991 and Prior Years (Apex Tax Investments,
Inc., *et al.*, Appellees, v. Mary Lowe, Deceased, by
Patrick T. Murphy, Cook County Public Guardian
and Supervised Administrator of the Estate of
Mary Lowe, Appellant).

*Opinion filed October 20, 2005.*

2

KARMEIER, J., took no part.

Patrick T. Murphy and Charles Perez Golbert, of the Office of the Cook County Public Guardian, of Chicago, for appellant.

Denise Brewer & Associates, and Deborah L. King, of Chicago, for appellees.

Mark J. Heyrman and Virginia Kim, of Chicago, for *amici curiae* Mental Health Association in Illinois *et al.*

JUSTICE McMORROW delivered the opinion of the court:

Apex Tax Investments, Inc. (Apex), purchased the home of Mary Lowe at a tax sale and was issued a tax deed for the property by order of the circuit court of Cook County. Subsequently, the Cook County public guardian, on behalf of the estate of Mary Lowe, filed an amended petition pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994)) and section 22—45 of the Property Tax Code (35 ILCS 200/22—45 (West 1994)) seeking to have the tax deed set aside. In the amended petition, the public guard-

ian alleged that at the time Apex attempted to provide Lowe with the notice required by section 22—10 of the Property Tax Code (35 ILCS 200/22—10 (West 1994)), Lowe was hospitalized for schizophrenia. The public guardian further alleged that Apex should have known of Lowe's mental impairment based on notations made by a mail carrier on the envelopes of two letters that were mailed to Lowe but returned, undelivered. Based on these allegations, the public guardian contended that Apex had not complied with the statutory notice requirements of the Property Tax Code and that Lowe's "due process right to adequate notice" had been violated.

Following a hearing, the circuit court denied the public guardian's petition. The appellate court affirmed. No. 1—02—1101 (unpublished order under Supreme Court Rule 23). For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

The procedures governing tax sales and the issuance of tax deeds are set forth in article 21, division 4, and article 22 of the Property Tax Code. 35 ILCS 200/21— 190 *et seq.*, 22—5 *et seq.* (West 1994). Pursuant to section 21—190, the county collector may offer property for public sale when judgment has been rendered against that property for nonpayment of real estate taxes. The buyer of property at such a sale does not receive title to the property but, instead, receives a "certificate of purchase." 35 ILCS 200/21—250 (West 1994). The issuance of a certificate of purchase does not affect the delinquent property owner's legal or equitable title to the property. *Phoenix Bond & Indemnity Co. v. Pappas*, 194 Ill. 2d 99, 101 (2000). The property owner has the right to redeem the property, upon the payment of the tax arrearage and costs, until such time as the redemption period expires. 35 ILCS 200/21—345 through 21— 355 (West 1996); Ill. Const. 1970, art. IX, § 8.

"[W]ithin 5 months but not less than 3 months prior to the expiration of the redemption period," the tax purchaser may file a petition in the circuit court asking the court to enter an order directing the county clerk to issue a tax deed to the property. 35 ILCS 200/22—30 (West 1994). Before the tax purchaser may receive such an order, however, the redemption period must expire without any redemption taking place. In addition, as a condition to receiving a tax deed order, the tax purchaser must prove to the circuit court that it has strictly complied with the statutory notice provisions set forth in sections 22—10 through 22—25 of the Property Tax Code (35 ILCS 200/22—10 through 22—25 (West 1994)). See 35 ILCS 200/22—40 (West 1994).

In the case at bar, Apex purchased a parcel of residential real estate at the annual Cook County tax sale held on March 3, 1993. The property was improved with a single-family, split-level town house. On October 5, 1995, Apex filed a petition for a tax deed to the property in the circuit court of Cook County. Attached to the petition was Apex's certificate of purchase, which indicated that the property had been purchased for $347.61, the amount of a 1991 tax delinquency. The petition also stated that the redemption period expired by extension on February 21, 1996. See 35 ILCS 200/21—385 (West 1994). No redemption occurred by that date, and Apex's petition proceeded to an *ex parte* hearing before Judge Marjan Staniec on March 18, 1996. See 35 ILCS 200/22—40 (West 1994).

At the hearing, Apex's attorney informed the court about the efforts that had been made to comply with the statutory notice provisions of the Property Tax Code. Apex's attorney told the court that, from a tract search, Apex had learned that the property at issue was owned by two individuals, Mary Lowe and William Austin, and that this information was conveyed to the Cook County

sheriff and the clerk of the circuit court of Cook County. On October 26, 1995, in accordance with section 22—15 of the Property Tax Code (35 ILCS 200/22—15 (West 1994)), the Cook County sheriff attempted to personally serve Lowe, Austin and "occupant" with the "take notice" set forth in section 22—10. The section 22—10 take notice must be given "not less than 3 months nor more than 5 months prior to the expiration of the period of redemption." 35 ILCS 200/22—10 (West 1994). The notice must state, *inter alia*, that the property at issue has been sold for delinquent taxes, that the period of redemption expires on the date listed, that a petition for a tax deed has been filed, and that a hearing on the tax deed petition will be held at the time and place listed. See 35 ILCS 200/22—10 (West 1994).

As required by statute (see 35 ILCS 200/22—20 (West 1994)), the Cook County sheriff filed the returns of service for the section 22—10 take notices with the clerk of the circuit court. The returns of service were filed with the clerk on November 9, 1995, and were admitted into evidence during the hearing on Apex's petition. On each of the returns of service, the deputy sheriff who attempted to serve the notice wrote "House vacant per neighbors." The deputy sheriff also placed a mark next to the word "MOVED" on the preprinted form to indicate the reason why notice was not served.

Having failed to effect personal service on Austin, Lowe or "occupant," the sheriff also sent take notices to them at the property's address by certified mail, return receipt requested. See 35 ILCS 200/22—15 (West 1994). These three notices were returned to the sheriff, undelivered, and were subsequently filed with the clerk of the circuit court. At the hearing on Apex's petition, the envelopes for the three notices were admitted into evidence. The record on appeal contains the original, unopened envelope addressed to Austin, and photocopies of the envelopes addressed to Lowe and "occupant."

All three envelopes are postmarked November 8, 1995, and are stamped "returned to sender." On the envelope addressed to Austin, the word "deceased" is handwritten in pencil on the left side of the envelope. The sheriff filed this envelope with the clerk of the circuit court on November 22, 1995. The envelopes addressed to Lowe and "occupant" bear a stamp which indicates that attempts were made to deliver the notices on November 16, December 11, and December 18, 1995. In addition, on the left side of these two envelopes, written vertically, is a handwritten notation which reads: "Person is Hospitalized." Underneath these notations on both envelopes, also handwritten, is a number, "2719," and the letters "JHT." The notations on both of the envelopes have a line drawn through them and are obscured, in part, by the circuit court clerk's filing stamp and the post office's "returned to sender" stamps. The sheriff filed the envelopes addressed to Lowe and "occupant" with the clerk of the circuit court on January 2, 1996. Neither Apex's attorney nor the circuit court mentioned the notations on the envelopes at any time during the hearing on Apex's tax deed petition.

In accordance with section 22—25 of the Property Tax Code (35 ILCS 200/22—25 (West 1994)), the clerk of the circuit court of Cook County also sent take notices by certified mail addressed to Lowe, Austin and "occupant." Like the notices sent by the sheriff, these notices were returned, undelivered. The notices were filed in the court record (see 35 ILCS 200/22—25 (West 1994)) and were admitted into evidence at the hearing. The envelopes for the notices sent to Austin and "occupant," as well as a photocopy of the envelope sent to Lowe, are part of the record on appeal. All three envelopes are postmarked November 8, 1995, and are stamped "returned to sender." Notations on the envelopes indicate that attempts were made to deliver the notices on November 9,

November 15, and November 24, 1995. The clerk of the circuit court filed the notices addressed to Lowe and "occupant" in the court record on November 29, 1995, and the notice addressed to Austin on November 30, 1995.

Pursuant to sections 22—15 and 22—20 of the Property Tax Code (35 ILCS 200/22—15, 22—20 (West 1994)), Apex also provided publication notice to Lowe and Austin. The same notices that were sent by mail to the property were published in the Chicago Daily Law Bulletin on October 11, October 12, and October 13, 1995.

During the hearing on Apex's petition, Apex's attorney informed the court that Mary Lowe had conveyed her home through a quitclaim deed to herself and Austin, as joint tenants, in 1993. Apex's attorney explained to the court that, "attempting to be diligent in ascertaining the whereabouts" of Lowe and Austin, the Cook County sheriff had personally served the law firm which prepared the 1993 quitclaim deed with a section 22—10 take notice. In addition, the clerk of the circuit court sent notice to the firm by certified mail on November 8, 1995. The First National Bank of Chicago, in its capacity as a mortgagee of the property, was also personally served with a take notice on October 24, 1995. And, the clerk of the circuit court sent notice by certified mail to the bank on November 8, 1995.

Apex's agent, Fred Berke, also testified at the hearing regarding the efforts Apex made to locate Lowe and Austin. Berke stated that he had visited the property at issue and inspected it on Apex's behalf. Berke testified that after arriving at the town house, he knocked on the door and looked in the living room window. He saw no furniture inside the home. He also spoke to a next-door neighbor who told him that the owner of the property was "the Lowes" but that no one was currently living there. Berke told the court that the home appeared to be uninhabited.

Finally, Apex's attorney stated to the court that, after taking the preceding actions, and after checking city and suburban phone directories and voter registration records, Apex was "unable to develop any address for William Austin or Mary Lowe other than the subject property address." According to Apex's attorney, "all regular efforts" to locate Lowe and Austin had "proved fruitless."

At the close of the hearing, the circuit court found that the redemption period had expired and that no redemption had been made. The court further found that Apex had complied with the notice provisions of the Property Tax Code. The court found, in particular, that Apex had exercised "due diligence" in attempting to locate Lowe and Austin, thereby satisfying the requirement set forth in section 22—15 that the tax purchaser make a "diligent inquiry" to find the property owner and interested parties. 35 ILCS 200/22—15 (West 1994). The circuit court continued the matter to allow Apex to provide a transcript of the proceedings and to submit proof of its payment of taxes for the years subsequent to 1991. See 35 ILCS 200/22—40 (West 1994). Thereafter, on May 20, 1996, the circuit court entered a written order which stated that, "upon proofs and exhibits heard and offered in open court," the court had found that Apex "fully complied with all of the Statutes and the Constitution of the State of Illinois relating to sales of real estate for taxes and the issuance of tax deeds pursuant thereto." The order directed the county clerk to issue Apex a tax deed to the property, and the deed was issued that same day.

Approximately seven months later, on December 6, 1996, Apex entered into an installment contract to sell the property to a third-party, John Herndon. Under the terms of this contract, Herndon was to pay a total of $10,000 for the property, with $3,000 in earnest money

to be applied to the purchase price, and a $2,000 payment due on December 9, 1996. The final installment payment was due March 31, 1999. In deposition testimony taken on March 10, 1999, Herndon stated that he had made a $3,000 and a $2,000 payment to Apex, but that he had not, as of that date, paid anything further on the contract. He also stated that he had not closed on the home, and that he had not received a deed for the property.

Herndon further stated in his deposition testimony that the property was in substantial disrepair when he purchased it. According to Herndon, there was garbage and water throughout the house, windows were broken, and the front door was "wide open." Herndon described the home as "an abandoned building." Herndon stated that, after entering into the installment contract with Apex, he invested over $20,000 in material and labor into renovating the property. Although it is not clear from the record precisely when these renovations began, it appears that they were completed by early 1998.

Approximately nine months after Apex entered into the contract with Herndon, on September 5, 1997, two of Mary Lowe's sons, Bruce and Mario Lowe, filed a *pro se* petition for "Restoration of Property Ownership" in the circuit court of Cook County. In this petition, Bruce Lowe stated that his mother had "been in and out of various mental facilities for the past 30 years of her life," and that she had been hospitalized in a mental health facility from August 26, 1995, to December 17, 1996. Bruce further stated that his mother had been released to his custody and that she was currently residing with him in California. Bruce also contended in the petition that personal service on an incompetent individual violates the individual's right to due process and asked the court to "reinstate full rights of ownership to Mary Lowe."

Based on Bruce Lowe's allegation that his mother

was mentally disabled, the circuit court appointed the Cook County public guardian to represent Mary Lowe in early November 1997. On November 10, 1997, the public guardian filed a petition pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994)) and section 22—45 of the Property Tax Code (35 ILCS 200/22—45 (West 1994)), seeking to have the tax deed that had been issued to Apex set aside. An amended petition was filed on April 17, 1998.

In the amended petition, the public guardian alleged that Mary Lowe suffered from schizophrenia and that she had been hospitalized in the Tinley Park Mental Health Center at the time the section 22—10 take notices were sent to her property in November 1995. The petition also noted that two of the notices mailed by the Cook County sheriff had been returned with the notations "Person is hospitalized 2719 JHT" written on the envelopes. The petition alleged that these notations were written by a mail carrier, Jewel Hightower, and that the number "2719" was her postal route number and the letters "JHT" were her initials. The petition further alleged that Apex never attempted to contact Hightower or the post office. Therefore, according to the public guardian, Apex "failed to make a diligent inquiry" as to the whereabouts of Mary Lowe and failed to satisfy the notice requirements of the Property Tax Code.

The public guardian's petition also asserted that Mary Lowe had been denied her "due process right to adequate notice" prior to the deprivation of her real property. In support of this contention, the public guardian cited to *Covey v. Town of Somers*, 351 U.S. 141, 100 L. Ed. 1021, 76 S. Ct. 724 (1956), wherein the Supreme Court held that "[n]otice to a person known to be an incompetent who is without the protection of a guardian does not measure up to [the requirements of due process]." *Covey*, 351 U.S. at 146, 100 L. Ed. at 1026, 76 S.

Ct. at 727. In addition, the petition asserted that Lowe's due process rights were violated because, given Lowe's mental disability, even if she had received the notices mailed by Apex to her home, those notices would have been meaningless to her.

On August 12, 1998, John Herndon filed a motion to dismiss the public guardian's amended petition. In this petition, Herndon contended that, by virtue of his December 6, 1996, contract with Apex, he was a *bona fide* purchaser of the property at issue. In a subsequent filing, Herndon further contended that, after he paid $5,000 to Apex under the installment contract, and spent over $20,000 in improvements on the property, an equitable conversion occurred (see *Shay v. Penrose*, 25 Ill. 2d 447 (1962)), and he became a *bona fide* purchaser of the property on this basis as well. Citing to subsection (e) of section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401(e) (West 1994)) Herndon argued that a *bona fide* purchaser's interest in property cannot be affected by the filing of a section 2—1401 petition and, therefore, that the public guardian's amended petition should be dismissed.

In a written order entered on June 8, 1999, the circuit court rejected Herndon's arguments. Relying on *Daniels v. Anderson*, 162 Ill. 2d 47, 60-61 (1994), the court determined that Herndon's contract with Apex did not render Herndon a *bona fide* purchaser because Herndon had knowledge of Mary Lowe's interest in the property in August 1998, several months before he would have acquired title to the property under the terms of the contract. The circuit court also rejected Herndon's equitable conversion theory. The court reasoned that Apex knew or should have known that Lowe was hospitalized, based on the notations written by Jewel Hightower on the returned envelopes. The circuit court concluded, without further elaboration, that Apex's

actual or constructive knowledge of Lowe's hospitalization should be imputed to Herndon and, therefore, that the "equitable conversion theory [was] not applicable and that Herndon at his own risk undertook to purchase and to rehab the property."

On August 18, 2000, the public guardian filed a motion to stay proceedings. In this motion, the public guardian stated that it had recently learned that Mary Lowe died on November 15, 1998, and that since that time, Bruce Lowe had "fraudulently misrepresented to the Public Guardian" that she was alive.[1] The public guardian sought to stay the proceedings, "pending the appointment of an appropriate representative, for the estate of May Lowe, to pursue the Petition to Set Aside the Tax Deed." On September 6, 2000, the circuit court entered an order dismissing the amended petition to set aside the tax deed.

Thereafter, the probate division of the circuit court of Cook County entered an order appointing the public guardian as administrator to collect for the estate of Mary Lowe. The public guardian then filed a motion to vacate the circuit court's order of September 6, 2000, and to substitute the public guardian as the proper party to prosecute the amended petition to set aside the tax deed. In a written filing, Apex contested this motion. Apex disputed whether the public guardian had, in fact, ever been appointed to represent Mary Lowe, and further contended that any such representation of Mary Lowe should not have been permitted under the relevant statutory authority. In response, the public guardian submitted a written filing that included an affidavit from Judge

---

[1]In a letter to the public guardian, Bruce Lowe apologized for not disclosing his mother's death. Bruce stated that he did not inform the public guardian of Mary Lowe's death because he was concerned that "disclosure would further delay this matter" and that he would "lose the support of the Public Guardian's Office."

Staniec, who had retired from the bench in July 1999. In this affidavit, Judge Staniec confirmed that he had appointed the public guardian to represent Lowe in November of 1997. Judge Staniec also stated that, if he had "been advised that Mary Lowe was hospitalized during the applicable notice serving periods," he would not have issued a tax deed order to Apex. On June 27, 2001, the circuit court vacated the order of September 6, 2000, and entered an order substituting the public guardian, now serving as administrator to collect for the estate of Mary Lowe, as the proper party to prosecute the amended petition.

The public guardian's amended petition to set aside the tax deed proceeded to an evidentiary hearing on February 20, 2002. At the outset, the circuit court explained that, although it had been determined that Herndon was not entitled to the legal status of *bona fide* purchaser, he would be allowed to participate in the hearing because he had purchased the property at issue.

The public guardian was the only litigant to present testimony at the hearing. Dr. Bernard Rubin, an expert in the field of psychiatry, was the public guardian's first witness. Rubin testified that he reviewed Mary Lowe's mental-health records from 1964 through 1996 and spoke to Mary Lowe's son, Bruce Lowe, by telephone on four occasions. Rubin never spoke to, or saw, Mary Lowe.

From his review of her mental-health records, Rubin concluded that Mary Lowe suffered from disorganized, chronic schizophrenic disorder, the most severe form of schizophrenia. Rubin stated that Lowe suffered from intermittent bouts of schizophrenia from the early 1960s until 1995. In January 1995, following the death of her companion, William Austin, Lowe was hospitalized briefly in the Tinley Park Mental Health Center. She was admitted to that hospital in August 1995 and remained there until her discharge in December 1996. Rubin stated that,

from January 1995 until October 1996, Lowe suffered from a mental illness, was generally incompetent, and had no capacity to care for her personal needs or to fulfill social or business responsibilities. According to Rubin, Lowe would not have been able to understand, or respond to, legal documents served upon her between January 1995 and October 1996. Rubin stated that psychotropic medication began to improve Lowe's condition in October 1996 and that she was subsequently released to the custody of her son.

The public guardian also offered testimony from Jewel Hightower. Hightower testified that she worked for the United States Postal Service as a mail carrier and that the property at issue in this case was on her delivery route. Hightower stated that she wrote "person is hospitalized" on the letters sent by the sheriff to Mary Lowe and "occupant" and returned the letters to their sender. Hightower further stated that the number "2719," which appeared under the words "person is hospitalized," was her postal route number and that the letters "JHT" were her initials. Hightower stated that, although she knew Lowe was in the Tinley Park Mental Health Center at the time the take notices from the sheriff were sent to Lowe, she did not provide this information on the envelopes. According to Hightower, postal regulations allowed her to note that an addressee was hospitalized but did not allow her to note anything more specific. Hightower also explained that someone wanting to learn of Lowe's exact whereabouts could have done so if they had come to the post office and filled out the "proper forms."[2] Hightower stated that neither she, nor anyone at the post office, was contacted about the notations on the envelopes.

---

[2]Hightower did not further identify the statute or regulation which would authorize the postal service to disclose Mary Lowe's hospitalization in a mental-health facility.

On April 9, 2002, the circuit court denied the public guardian's amended petition to set aside the tax deed. In a ruling issued from the bench, the circuit court noted that the amended petition was brought under section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994)) as limited by section 22—45 of the Property Tax Code (35 ILCS 200/22—45 (West 1994)). The court further noted that under subsection (3) of section 22—45 of the Property Tax Code, a tax deed may be set aside when there is "proof by clear and convincing evidence" that the tax deed order was "procured by fraud or deception." 35 ILCS 200/22—45(3) (West 1994). The circuit court reviewed the evidence of record and concluded that Apex had not procured its tax deed order through fraud or deception.

With respect to the public guardian's constitutional arguments, the circuit court stated that the notice provisions of the Property Tax Code, "as applied, can result in a due process violation where a person with an interest in the property is mentally incompetent and the tax deed petitioner either knew or reasonably should have known [of] that disability." The circuit court found that Dr. Rubin's opinion that Mary Lowe was incompetent was correct and noted that "given Ms. Lowe's capacity, even if she had received that notice, she wouldn't have been able, in all likelihood, to understand or act upon it." However, the circuit court also noted that an individual may be hospitalized for many reasons that have nothing to do with mental illness. From this, the court determined that, even if the notations made by Jewel Hightower alerted Apex to the fact that Lowe was hospitalized, that did not mean that Apex knew, or should have known, that Lowe was mentally impaired. Because Apex had no knowledge of Lowe's impairment, the court concluded there was no due process violation.

The appellate court, adopting much of the circuit

court's reasoning, affirmed. No. 1—02—1101 (unpublished order under Supreme Court Rule 23). We granted the public guardian's petition for leave to appeal. 177 Ill. 2d R. 315(a). We also granted leave to the Mental Health Association in Illinois and the Mental Health Project of the University of Chicago Law School's Edwin F. Mandel Legal Aid Clinic to file an *amicus curiae* brief in support of the estate of Mary Lowe.

## ANALYSIS

The public guardian advances both statutory and constitutional grounds for relief. We first consider the public guardian's statutory arguments.

### Statutory Relief

The public guardian's petition to set aside the tax deed issued to Apex is a collateral attack upon the circuit court's tax deed order, brought under section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1994)). Collateral attacks upon tax deed orders implicate two competing public policies. On the one hand, "[t]he forced sale of a home is a grave and melancholy event" (*Smith v. D.R.G., Inc.*, 63 Ill. 2d 31, 39 (1976)) that can have severe consequences for the delinquent taxpayer. Allowing a collateral attack upon the tax deed order provides the delinquent taxpayer with an opportunity, in addition to the direct appeal, to ensure that the order was properly obtained. On the other hand, the availability of a collateral challenge to the tax deed order tends to undermine the finality and, hence, the marketability of the tax deed. This point is significant because tax purchasers participate in the tax sale system in order to obtain marketable titles. See *Village of Dolton v. First National Bank of Blue Island*, 12 Ill. 2d 435, 440 (1957) ("Our whole system of judicial sales is based upon the public's willingness to accept titles thereby created"). If tax purchasers do not participate in tax sales, then

delinquent taxpayers lose the incentive to pay their real estate taxes and tax revenues fall. See *Cherin v. The R.&C. Co.*, 11 Ill. 2d 447, 451-53 (1957); G. Turano, *Equitable Relief, Collateral Attack and the Illinois Tax Deed*, 51 Chi.-Kent L. Rev. 725, 725-26 (1975); D. Karlen & R. Slutzky, *A Guide to Tax Deed and Indemnity Fund Proceedings*, in Real Estate Taxation § 11.37, at 11—75 (Ill. Inst. for Cont. Legal Educ. 2005) ("Participation by tax purchasers is essential to the tax collection process because tax purchasers represent a threat to property owners that will induce them to make timely payments").

Over the past several decades, the balance between the competing policies of ensuring the propriety of tax deed orders by permitting collateral challenges to such orders, and preserving the marketability of tax deeds, has been struck in different ways. In 1951, the legislature substantially revised the Revenue Act of 1939 (Ill. Rev. Stat. 1951, ch. 120, par. 482 *et seq.*), the predecessor statute to the Property Tax Code. As this court has frequently noted, these revisions were undertaken, in large part, to improve the marketability and validity of tax titles in order to reduce real estate tax delinquencies. See, *e.g.*, *In re Application of the County Treasurer*, 92 Ill. 2d 400, 406 (1982) (observing that, before 1951, tax deeds "amounted to little more than a cloud on the title of the delinquent owner"); L. Dotson, Note, 40 Chi.-Kent L. Rev. 155, 157-58 (1963). Prior to the 1951 revisions, the decision as to whether the statutory requirements for obtaining a tax deed had been met, including whether notice requirements had been satisfied, was made administratively, by the county clerk. The 1951 revisions altered this practice and made the issuance of the tax deed a judicial decision, made by the county court upon petition. Ill. Rev. Stat. 1951, ch. 120, par. 747; *In re Application of the County Treasurer*, 214 Ill. 2d 253, 262 (2005); *Cherin*, 11 Ill. 2d at 451-53. Section 266 of the

Revenue Act was also amended to provide that the tax deed order would be "incontestable" except by direct appeal. Ill. Rev. Stat. 1951, ch. 120, par. 747; *Cherin*, 11 Ill. 2d at 453. No provision in the Revenue Act allowed for collateral challenges to the tax deed order. Further, section 266 was amended to state that it was to "be liberally construed so that tax deeds herein provided for shall convey merchantable title." Ill. Rev. Stat. 1951, ch. 120, par. 747.

Seven years after the 1951 revisions to the Revenue Act, in *Southmoor Bank & Trust Co. v. Willis*, 15 Ill. 2d 388 (1958), this court addressed the "delicate problem" of construing section 266 of the Revenue Act, which, as noted, did not permit collateral attacks upon tax deed orders, with section 72 of the Civil Practice Act (Ill. Rev. Stat. 1957, ch. 110, par. 72), the statutory predecessor to section 2—1401. *Southmoor Bank*, 15 Ill. 2d at 394. Examining the two statutes, this court observed that section 72 established a uniform procedure "for obtaining relief from all final orders, judgments and decrees within its purview." *Southmoor Bank*, 15 Ill. 2d at 394-95. Reasoning that section 72 and section 266 of the Revenue Act were *in pari materia*, we concluded "that the legislature desired to render tax titles incontestable except by direct appeal, subject to the provisions of section 72 of the Civil Practice Act." *Southmoor Bank*, 15 Ill. 2d at 394. The court further noted, however, that unless a lack of jurisdiction affirmatively appeared on the record, "the prior finding of the county court of compliance with all the provisions of law entitling petitioner to a tax deed could not *** be disputed in [the section 72] proceeding." *Southmoor Bank*, 15 Ill. 2d at 396.

In *Remer v. Interstate Bond Co.*, 21 Ill. 2d 504 (1961), this court again observed that a county court's findings that the statutory prerequisites to issuing a tax deed had been complied with could not be challenged collaterally,

unless a lack of jurisdiction appeared on the face of the record. *Remer*, 21 Ill. 2d at 510. However, this court also stated that allegations of fraud could be raised in a collateral attack upon the tax deed order. We reasoned that such allegations fit within the requirements of section 72 and that "elementary principles of law require that relief be granted" where "proceedings regular in form are tainted with fraud and coercion." *Remer*, 21 Ill. 2d at 514. Thereafter, in *Urban v. Lois, Inc.*, 29 Ill. 2d 542 (1963), we reiterated this rule, stating:

> "It has been well established in tax-deed proceedings that section 72 cannot be used as a vehicle to relitigate any issue already passed on by the trial court, in the absence of fraud." *Urban*, 29 Ill. 2d at 548.

In so holding, we explained why the scope of collateral attack upon the tax deed order was a limited one:

> "If we were to hold otherwise, we would abrogate the efficacy of the 1951 amendments to the Revenue Act, and would defeat the desired conclusiveness of the county court's order for the issuance of a tax deed. The consequent effect upon the merchantability of tax titles would place the annual sale in the same status as existed before the 1951 amendments and which the legislature intended to change." *Urban*, 29 Ill. 2d at 549.

In 1967, the legislature amended section 266 of the Revenue Act to state that relief from an order granting a tax deed could be had under section 72 of the Civil Practice Act, thereby expressly confirming this court's holding to that effect in *Southmoor Bank*. See Ill. Rev. Stat. 1967, ch. 120, par. 747.

In 1982, in *In re Application of the County Treasurer*, 92 Ill. 2d 400, 408 (1982), this court again addressed the scope of collateral relief available in tax deed cases. After reviewing the relevant case law, as well as various revisions that had been made to the Revenue Act by the General Assembly, we concluded that the legislature intended to protect tax deed orders from collateral attack "on questions relating to notice." *County Treasurer*, 92

Ill. 2d at 408. Accordingly, we chose to "adhere to our previous holdings that section 72 relief in tax-deed cases is limited to those cases where fraud is proved or the judgment is void." *County Treasurer*, 92 Ill. 2d at 408.

During the 1990s, the legislature twice addressed the issue of collateral challenges to tax deed orders. In amendments to section 266 of the Revenue Act that were adopted in 1990, the General Assembly codified the holdings of decisions such as *County Treasurer* and *Urban* with respect to the grounds for relief that are available in a collateral attack upon a tax deed order. See 86th Ill. Gen. Assem., Senate Proceedings, May 10, 1990, at 62 (statements of Senator Lechowicz). In addition, the legislature created a new, statutory ground for collateral relief that is available in certain circumstances where the tax deed order "was effectuated pursuant to a negligent or willful error made by an employee of the county clerk or county collector." Ill. Rev. Stat. 1991, ch. 120, par. 747. Also, the 1990 amendments added language to section 266 which states that the grounds for relief that are available in a collateral attack upon a tax deed order "shall be limited" to those enumerated in the statute. See Ill. Rev. Stat. 1991, ch. 120, par. 747.

In 1993, the General Assembly created an additional statutory ground for collateral relief from a tax deed order. Generally stated, this ground may be invoked by a person or party with a recorded interest in the tax deed property who was not served with notice in any manner whatsoever. See 35 ILCS 200/22—45(4) (West 1994).

The amendments enacted by the General Assembly in 1990 and 1993 are currently found in section 22—45 of the Property Tax Code (35 ILCS 200/22—45 (West 1994)). Section 22—45 expresses the balance struck by the legislature between the public policies of allowing collateral relief from tax deed orders and preserving the marketability of tax deeds. Section 22—45 provides:

"Tax deeds issued under Section 22—35[3] are incontestable except by appeal from the order of the court directing the county clerk to issue the tax deed. However, relief from such order may be had under Section 2—1401 of the Code of Civil Procedure in the same manner and to the same extent as may be had under that Section with respect to final orders and judgments in other proceedings. The grounds for relief under Section 2—1401 shall be limited to:

(1) proof that the taxes were paid prior to sale;

(2) proof that the property was exempt from taxation;

(3) proof by clear and convincing evidence that the tax deed had been procured by fraud or deception by the tax purchaser or his or her assignee; or

(4) proof by a person or party holding a recorded ownership or other recorded interest in the property that he or she was not named as a party in the publication notice as set forth in Section 22—20, and that the tax purchaser or his or her assignee did not make a diligent inquiry and effort to serve that person or party with the notices required by Sections 22—10 through 22—30.

In cases of the sale of homestead property in counties with 3,000,000 or more inhabitants, a tax deed may also be voided by the court upon petition, filed not more than 3 months after an order for tax deed was entered, if the court finds that the property was owner occupied on the expiration date of the period of redemption and that the order for deed was effectuated pursuant to a negligent or willful error made by an employee of the county clerk or county collector during the period of redemption from the sale that was reasonably relied upon to the detriment of any person having a redeemable interest." 35 ILCS 200/22—45 (West 1994).

In the case at bar, the public guardian argues that the tax deed issued to Apex should be set aside because there is "clear and convincing evidence" that the tax deed order was "procured by fraud or deception." 35 ILCS 200/22—45(3) (West 1994). The public guardian

---

[3]This reference to "Section 22—35" has been changed to "Section 22—40." See 35 ILCS 200/22—45 (West Supp. 2004).

notes that, at the hearing on Apex's petition for issuance of a tax deed order, Apex's attorney represented to the circuit court that it had strictly complied with the Property Tax Code's notice provisions, that it had been unable to ascertain Mary Lowe's whereabouts despite having conducted a diligent search, and that there were "no minors, incompetents, or estates that appear to have an interest in the property." The public guardian contends that "in view of Apex's willful ignorance with respect to the notations on the undelivered envelopes" these representations constitute fraud or deception under section 22—45 and, therefore, that the tax deed issued to Apex should be set aside.

In the context of tax deed proceedings, fraud is defined as " 'a wrongful intent—an act calculated to deceive.' " *County Treasurer*, 92 Ill. 2d at 405, quoting *Dahlke v. Hawthorne, Lane & Co.*, 36 Ill. 2d 241, 245 (1966); see also *Smith v. D.R.G., Inc.*, 63 Ill. 2d 31, 37 (1976); *Exline v. Weldon*, 57 Ill. 2d 105, 110 (1974); *Zeve v. Levy*, 37 Ill. 2d 404, 409 (1967). This level of wrongdoing has not been established here.

The envelopes with Jewel Hightower's notations on them were returned by the post office to their sender, the Cook County sheriff. The sheriff submitted the envelopes to the clerk of the circuit court, who then placed the envelopes in the court file which, by statute, the clerk is required to maintain in tax deed cases. See, *e.g.*, 35 ILCS 200/22—20, 22—25 (West 1994). There was nothing unusual or unexpected about the fact that the envelopes were returned, undelivered. Both an agent from Apex and a deputy sheriff from the Cook County sheriff's office had visited the property, found it vacant, and been told by neighbors that the occupants of the home had moved. Further, the notations on the envelopes addressed to Mary Lowe and "occupant," though legible, cannot reasonably be called prominent. The notations have a

line drawn through them and they are partially obscured by the circuit court clerk's filing stamps and the post office's "returned to sender" stamps. More important, there is no evidence that Apex attempted to conceal the notations or alter the envelopes in any way. To the contrary, the envelopes were submitted into evidence by Apex along with the other portions of the record, and the circuit court explicitly relied upon them in rendering its decision to enter the tax deed order.

On this record, the most that can be said with respect to Apex's actions is that Apex simply failed to discover the notations on the envelopes. However, as this court has frequently noted, the failure to uncover a particular fact during the search for a delinquent taxpayer does not, by itself, establish fraud. *Dahlke*, 36 Ill. 2d at 246; *Exline*, 57 Ill. 2d at 110 ("even if a more persistent effort could have been made in the conduct of the search and inquiry [for the delinquent taxpayer], this is not proof of fraud unless there exists evidence of wrongful intent or a deceptive design"); *Zeve*, 37 Ill. 2d at 409; see also *County Treasurer*, 92 Ill. 2d at 407-09 (error in service which was at most negligence did not constitute fraud). Moreover, the fact that the envelopes were submitted into evidence and relied upon by the circuit court is a strong indication that there was no deceptive or fraudulent act on the part of Apex. See *In re Application of the County Treasurer & ex officio County Collector*, 267 Ill. App. 3d 993, 998-99 (1994) (no deceptive act takes place when all relevant information is openly presented to the court); *In re Application for Judgment & Sale by the County Treasurer & ex officio County Collector*, 276 Ill. App. 3d 1084, 1090 (1995) (same); *In re Application of County Treasurer & Ex-Officio County Collector*, 20 Ill. App. 3d 291, 298 (1974) (same).

The record in this case does not show, by clear and convincing evidence, "a wrongful intent" or "an act

calculated to deceive." *Dahlke*, 36 Ill. 2d at 245. Accordingly, we affirm the circuit court's judgment that the tax deed order was not obtained by fraud or deception.

Citing to *In re Application of the County Collector for Judgment & Order of Sale Against Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1982 & Prior Years*, 202 Ill. App. 3d 405 (1990), the public guardian also argues that, even if Apex's actions were not fraudulent, this court should invoke its "equitable powers" to void the tax deed order and return the property at issue to Mary Lowe's estate. The public guardian argues that Mary Lowe lost her home through no fault of her own, and emphasizes that Judge Staniec, in the affidavit which he submitted to the circuit court, stated that he would not have issued the tax deed order if he had known that Lowe was hospitalized in 1995 and 1996. According to the public guardian, it would be unjust not to allow Lowe's estate to recover the property and, therefore, under principles of equity, the tax deed should be set aside.

In *County Collector*, a tract search prepared from a title company's own tract indices, rather than official public records, failed to disclose a properly recorded mortgage. Relying on the results of the tract search, and not knowing that the results were inaccurate, the circuit court issued a tax deed order. *County Collector*, 202 Ill. App. 3d at 408-09. Thereafter, the holder of the properly recorded mortgage filed a section 2—1401 petition, seeking to have the tax deed set aside. Because the tax deed order had not been obtained by fraud, the circuit court declined to vacate it. However, the circuit court stated that it would not have issued the tax deed order had it known of the recorded interest and expressed the opinion that, were equity to apply, the tax deed should be set aside. *County Collector*, 202 Ill. App. 3d at 409-10.

On appeal, the appellate court reversed. Citing to *In*

*re Application of the County Treasurer & Ex Officio County Collector of Cook County, Illinois, for Judgment & Order of Sale Against Real Estate Rendered Delinquent for the Nonpayment of 1980 Taxes*, 185 Ill. App. 3d 789 (1989), and *In re Application of the County Treasurer & Ex Officio County Collector*, 171 Ill. App. 3d 644 (1987), two cases in which tax deeds were set aside because of errors committed by the county clerk, the appellate court concluded that not all circumstances under which tax deeds should be set aside fit within the framework of fraud. The appellate court held that "equitable principles" may be relied upon by the courts under section 2—1401 "to afford relief for parties who, through no fault of their own (and through no fraud by any party), stand to lose property in which they have a considerable interest." *County Collector*, 202 Ill. App. 3d at 414-15. The appellate court observed that the case before it was one in which " 'no attempt was made to serve the interested party by any means' " (*County Collector*, 202 Ill. App. 3d at 413), and that it would be unjust to let the tax deed stand. Accordingly, the appellate court vacated the tax deed order. *County Collector*, 202 Ill. App. 3d at 416-17.

*County Collector*, and the appellate decisions it relied upon, are not helpful to the public guardian in the case at bar because those cases were decided prior to the passage of the 1990 amendments to section 266 of the Revenue Act. At the time *County Collector* was decided, section 266 stated that relief from tax deed orders could be had under section 2—1401 "in the same manner, upon the same grounds and to the same extent as may be had under that Section with respect to final orders, and judgments in other proceedings." Ill. Rev. Stat. 1989, ch. 120, par. 747. The scope of collateral challenges to tax deed orders was thus a matter of judicial decision as to what constituted appropriate grounds for relief under section

2—1401. See, *e.g.*, *County Collector*, 202 Ill. App. 3d at 410. After the passage of the 1990 amendments, this was no longer the case. The 1990 amendments added language, currently found in section 22—45 of the Property Tax Code, which states that "[t]he grounds for relief under Section 2—1401 shall be limited to" those enumerated in the statute. 35 ILCS 200/22—45 (West 1994). General, "equitable principles" is not one of the grounds for relief listed in section 22—45.

Further, we note that the result reached by *County Collector*, *i.e.*, that a party with a recorded interest in property who receives no section 22—10 notice whatsoever may seek relief under section 2—1401, has been codified by the General Assembly in section 22—45(4) (35 ILCS 200/22—45(4) (West 1994)). In addition, clerical error has been added as a basis for redemption. See 35 ILCS 200/22—45 (West 1996). However, while the General Assembly has enacted these specific grounds for relief, it has not enacted the broader holding, found in *County Collector*, that general, equitable principles are a basis for relief in all collateral challenges to tax deed orders brought under section 2—1401.

At present, section 22—45 does not contain, as a ground for relief, a general equity provision. See *In re Application of the County Treasurer & ex officio County Collector*, 304 Ill. App. 3d 502, 505 (1999); *In re McKeever*, 132 B.R. 996, 1015 (Bankr. N.D. Ill. 1991); D. Karlen & R. Slutzky, *A Guide to Tax Deed and Indemnity Fund Proceedings*, in Real Estate Taxation § 11.31, at 11—63 (Ill. Inst. for Cont. Legal Educ. 2005). Accordingly, we may not consider the public guardian's argument that the tax deed at issue in this case should be set aside, under section 2—1401, based on equitable principles.

This is not to say, however, that the General Assembly is unconcerned about achieving equity in cases such as

this, or that Mary Lowe's estate has no statutory remedy. As the circuit court below noted, an alternative form of relief is available to Lowe's estate under the indemnity provisions of the Property Tax Code. See 35 ILCS 200/21—295 *et seq.* (West 1994). The indemnity provisions were enacted by the legislature in 1970 in recognition of the fact that taxes may go unpaid, and property may be lost to a tax deed, because of circumstances such as mental or physical disability that are beyond the property owner's control. See G. Turano, *Equitable Relief, Collateral Attack and the Illinois Tax Deed*, 51 Chi-Kent L. Rev. 725, 733 (1974). The provisions create an indemnity fund, from which, pursuant to section 21—305 (35 ILCS 200/21—305 (West 1994)), the former property owner may seek a monetary award for the loss of property. At the time relevant here, section 21—305 provided:

"(a) Any owner of property sold under any provision of this Code, who without fault or negligence of his or her own sustains loss or damage by reason of the issuance of a tax deed under Sections 22—40 or 21—445 and who is barred or in any way precluded from bringing an action for the recovery of the property or any owner of property containing 4 or less dwelling units who resided thereon the last day of the period of redemption who, in the opinion of the Court which issued the tax deed order, is equitably entitled to just compensation, has the right to indemnity for the loss or damage sustained. Indemnity shall be limited to the fair cash value of the property as of the date that the tax deed was issued, less any mortgages or liens thereon.[4]

*** The Court shall liberally construe this Section to

---

[4]Section 21—305 has since been amended to make clear that an owner who resides on property with four or fewer dwelling units, and who is seeking an award of $99,000 or less, may recover from the indemnity fund by showing equitable entitlement. The owner does not have to show a lack of fault or lack of negligence for the loss. 35 ILCS 200/21—305 (West 2000). See also *Hedrick v. Bathon*, 319 Ill. App. 3d 599 (2001).

provide compensation wherever in the discretion of the Court the equities warrant such action." 35 ILCS 200/21—305 (West 1994).

Section 21—305 is well suited to achieve equity in this case. Mary Lowe is deceased. Moreover, although the record does not indicate when any member of Lowe's family last resided in her former home, at a minium, it would have been sometime before Lowe's hospitalization in 1995. Thus, in this case, the importance of the property at issue is not as a place of residence to Mary Lowe or her family, but as the primary asset in Lowe's estate. The indemnity fund can fully compensate Lowe's estate for the monetary value of the property. Further, John Herndon has indicated that, if the tax deed is set aside and the property returned to Lowe's estate, he will pursue an action against the estate to recover the $20,000 worth of improvements he made to the home. Even if such action proves unsuccessful, the estate would bear the cost of defending against the action. Using the indemnity provisions can give the estate the full value of the property without having to withstand the time and expense of any legal action brought by Herndon.

The General Assembly enacted the indemnity provisions to address situations such as that presented in the case at bar. The record indicates that the public guardian has filed a petition for indemnification on behalf of Mary Lowe and that the petition remains pending in the circuit court. After issuing its ruling in this case, the circuit court strongly urged the public guardian to continue the indemnification action on behalf of Mary Lowe's estate. We do so as well.

### Due Process Notice

The public guardian argues that the tax deed issued to Apex should be set aside because Mary Lowe was denied her "due process right to adequate notice" under the United States and Illinois Constitutions (U.S. Const.,

amend. XIV, § 1; Ill. Const. 1970, art. I, § 2) prior to the deprivation of her property.

The public guardian's due process argument focuses on the period from August 26, 1995, to December 17, 1996, when Lowe was hospitalized in the Tinley Park Mental Health Center with schizophrenia. It was during this time that Apex filed its petition for a tax deed and that Apex attempted to provide Lowe with the section 22—10 take notice pursuant to the procedures described in sections 22—15 through 22—25 of the Property Tax Code (35 ILCS 200/22—15 through 22—25 (West 1994)). We note, however, that under the Property Tax Code, a number of notice procedures must take place prior to the delivery and publication of the section 22—10 take notice. For example, before the county collector may offer a property for sale due to delinquent taxes, it must file an application for judgment and order of sale in the circuit court. The county collector must send notice of the application for judgment by certified or registered mail to the party in whose name the property taxes were last assessed not less than 15 days before the date of application for judgment is filed. See 35 ILCS 200/21—135 (West 1994). In addition, the collector must publish notice of its intent to file the application for judgment at least 10 days before the application is filed. See 35 ILCS 200/21—110, 21—115 (West 1994). Pursuant to section 21—175 (35 ILCS 200/21—175 (West 1994)), the county collector must present the application for judgment to the circuit court. At that time, those parties who wish to contest the application may appear and file objections. *Rosewell v. Chicago Title & Trust Co.*, 99 Ill. 2d 407, 414 (1984).

Once the circuit court has entered an order of sale, and the tax sale has been completed, additional notice must be provided. Section 22—5 of the Property Tax Code requires the county clerk to send a "take notice" by registered or certified mail to the party in whose name

the taxes were last assessed, "within 5 months"[5] after the date of the tax sale. See 35 ILCS 200/22—5 (West 1994). The section 22—5 take notice is similar, though not identical, to the section 22—10 take notice. The section 22—5 take notice must state, *inter alia*, that the property has been sold for delinquent taxes, that a petition for a tax deed will be filed, and that the taxpayer has a right to redeem the property by the date listed.[6] However, unlike the section 22—10 take notice, the section 22—5 take notice does not include the time and place the petition for the tax deed order will be heard. See 35 ILCS 200/22—5, 22—10 (West 1994).

In the case at bar, it is undisputed that Mary Lowe was mentally incapacitated from January 1995 through October 1996. However, the tax sale in this case, and the time periods for the procedures noted above, occurred in 1993. The circuit court made no finding regarding the competency, or incompetency, of Mary Lowe in 1993. Moreover, while Dr. Rubin testified as to Lowe's incapacity in 1995 and 1996, he did not testify with respect to her condition in 1993. Thus, it appears that, prior to the deprivation of her property, and at a time when there is no finding of record that she was incompetent, Lowe was given notice of the application for judgment and order of tax sale, had an opportunity to object to the application for judgment, was given notice that the tax sale had occurred, and was given notice that she had the right to redeem her property.

The fact that the Property Tax Code contains several

---

[5]Section 22—5 has since been amended to state that the notice in that provision must be given "within 4 months and 15 days" of the tax sale. 35 ILCS 200/22—5 (West 2000).

[6]The date listed for the expiration of the redemption period may differ between the section 22—5 take notice and the section 22—10 take notice depending on whether the tax purchaser extends the redemption period and, if so, when that extension is made. See 35 ILCS 200/21—385 (West 1994).

notice procedures that must be undertaken before the delivery and publication of the section 22—10 take notice raises an important question. In deciding whether Mary Lowe was denied her due process right to notice prior to the deprivation of her real property, should all of the tax sale and tax deed notice procedures found in the Property Tax Code—including the notice of the application for judgment and order of sale and the section 22—5 take notice—be considered? Or, as the public guardian suggests, should the procedures regarding the section 22—10 take notice be considered by themselves?

In *Rosewell v. Chicago Title & Trust Co.*, 99 Ill. 2d 407 (1984), this court considered "whether due process requires the county collector to give personal notice of an impending tax sale to all parties with an interest in the real estate." *Rosewell*, 99 Ill. 2d at 410. In answering this question in the negative, we examined the Property Tax Code as a whole and took note of the notice procedures, other than the notice provided for the tax sale, that are found in the Property Tax Code. We concluded that due process does not require that all interested parties receive personal notice of the tax sale in part because, after the tax sale occurs, the Property Tax Code requires that the interested parties receive notice by mail of the right to redemption. Only after this notice is sent are the parties' interests in the property finally terminated by the issuance of the tax deed order. *Rosewell*, 99 Ill. 2d at 414-16. In the case at bar, neither party addresses the analysis employed in *Rosewell* or discusses what effect, if any, compliance with the statutory notice procedures that precede the delivery and publication of the section 22—10 take notice would have on the public guardian's argument that due process was not satisfied in this case. However, we need not attempt to resolve this issue *sua sponte*. For reasons that follow, we conclude that, even if our due process analysis is limited solely to a consider-

ation of the procedures involving the section 22—10 take notice, and to the time period from 1995 to 1996, there is no basis for reversing the judgment of the appellate court.

The standard for determining whether statutory notice procedures meet the requirements of due process is set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652 (1950). See *Rosewell*, 99 Ill. 2d at 411-12 (applying *Mullane* to a claim brought against the Property Tax Code under the due process clause of the Illinois Constitution). At issue in *Mullane* was whether notice that was published in a newspaper in order to inform the beneficiaries of a common trust of a judicial settlement satisfied due process. Addressing this issue, the Supreme Court stated what has become the widely accepted test for determining the constitutionality of notice procedures:

> "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314, 94 L. Ed. at 873, 70 S. Ct. at 657.

In adopting the "reasonably calculated" standard, the Court explained that the method used to provide notice "must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it" and that "when notice is a person's due, process which is a mere gesture is not due process." *Mullane*, 339 U.S. at 315, 94 L. Ed. at 874, 70 S. Ct. at 657. The Court also emphasized, however, that "if with due regard for the practicalities and peculiarities of the case" the notice procedure reasonably conveys the necessary information, then "the constitutional requirements are satisfied." *Mullane*, 339 U.S. at 314-15, 94 L. Ed. at 873, 70 S. Ct. at 657. Applying these principles to the issue

before it, the Court held that notice by publication was sufficient for those beneficiaries "whose interests or whereabouts could not with due diligence be ascertained." *Mullane*, 339 U.S. at 317, 94 L. Ed. at 875, 70 S. Ct. at 659. However, publication notice was not sufficient for those "known present beneficiaries of known place of residence." *Mullane*, 339 U.S. at 318-20, 94 L. Ed. at 875-76, 70 S. Ct. at 659-60.

In 1983, in *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 77 L. Ed. 2d 180, 103 S. Ct. 2706 (1983), the Supreme Court considered the principles announced in *Mullane* within the context of a tax sale. At issue in *Mennonite* was the constitutionality of an Indiana statute that provided notice to a mortgagee of a pending tax sale only by publication. The Court held the statutory procedure invalid, stating that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party *** if its name and address are reasonably ascertainable." (Emphasis in original.) *Mennonite*, 462 U.S. at 800, 77 L. Ed. 2d at 188, 103 S. Ct. at 2712. In so holding, the Court stated that a governmental body charged with providing notice must make "reasonably diligent efforts" to locate the party to whom notice is being provided, but also stressed that the government is not "required to undertake extraordinary efforts to discover the identity and whereabouts of a [party] whose identity is not in the public record." *Mennonite*, 462 U.S. at 798 n.4, 77 L. Ed. 2d at 187 n.4, 103 S. Ct. at 2711 n.4. See also *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 490, 99 L. Ed. 2d 565, 578, 108 S. Ct. 1340, 1347 (1988) (the executor of an estate must make " 'reasonably diligent efforts' " "to uncover the identities of creditors. For creditors who are not 'reasonably ascertainable,' publication notice can suffice"), quoting

*Mennonite*, 462 U.S. at 798 n.4, 77 L. Ed. 2d at 187 n.4, 103 S. Ct. at 2711 n.4.

The notice procedures in the Property Tax Code have been held constitutional under *Mullane* and *Mennonite* by this court and others. See *Rosewell*, 99 Ill. 2d 407; *Balthazar v. Mari Ltd.*, 301 F. Supp. 103 (N.D. Ill. 1969), *aff'd*, 396 U.S. 114, 24 L. Ed. 2d 307, 90 S. Ct. 397 (1969); *Catoor v. Blair*, 358 F. Supp. 815 (N.D. Ill. 1973), *aff'd*, 414 U.S. 990, 38 L. Ed. 2d 231, 94 S. Ct. 345 (1973). The public guardian points out, however, that none of these decisions addressed the due process rights of the mentally ill in the context of tax sale cases. This issue was, however, considered by the United States Supreme Court in *Covey v. Town of Somers*, 351 U.S. 141, 100 L. Ed. 1021, 76 S. Ct. 724 (1956).

In *Covey*, the Supreme Court applied the principles of *Mullane* to a municipal tax lien sale where the delinquent taxpayer had no guardian and was known by town officials "to be a person without mental capacity to handle her affairs or to understand the meaning of any notice served upon her." *Covey*, 351 U.S. at 146, 100 L. Ed. at 1026, 76 S. Ct. at 727. Although the town officials had complied with the notice procedures found in the governing statute, the Court held that, given the taxpayer's mental incapacity, due process had not been afforded. Citing to *Mullane*'s "reasonably calculated" standard, the Court stated that "[n]otice to a person known to be an incompetent who is without the protection of a guardian does not measure up to [the requirement of due process]." *Covey*, 351 U.S. at 146, 100 L. Ed. at 1026, 76 S. Ct. at 727. Because the taxpayer "was wholly unable to understand the nature of the proceedings against her property" and because "the town authorities knew her to be an unprotected incompetent," the Court held that due process requirements had not been met. *Covey*, 351 U.S. at 147, 100 L. Ed. at 1026, 76 S. Ct. at 727. See also

*In re Application of the County Collector for Judgment & Order Sale Against Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1982 & Prior Years*, 188 Ill. App. 3d 1068 (1989) (applying *Covey*).

Although *Covey* involved a situation where the government had *actual* knowledge of the delinquent taxpayer's mental incapacity, the public guardian argues that the case may also be read as applying to those situations where the party charged with providing notice *should* have known of the taxpayer's incapacity. Applying this reading of *Covey* to the case at bar, the public guardian argues that Mary Lowe's due process rights were violated because Apex should have known of Lowe's mental illness. The public guardian reasons that, if Apex had been more diligent in conducting its search for Mary Lowe, it would have noticed the notations on the envelopes that were returned by the post office and filed by the sheriff in the circuit court. If Apex had noticed the notations, according to the public guardian, it would have known of Lowe's hospitalization, and would have known that the initials and numbers on the envelope belonged to a postal carrier. With this knowledge, Apex could have contacted the post office and learned that Lowe was in a mental hospital. And, once Apex knew that Lowe was in a mental hospital, it would have known that she was suffering from a mental disability. Thus, according to the public guardian, Apex should have known of Lowe's mental illness and, under *Covey*, due process was not satisfied.[7]

---

[7]The public guardian's argument is directed toward Apex and its purported failure to take adequate steps to notify Mary Lowe. Apex is a private party. Nevertheless, Apex does not dispute that it made "use of state procedures with the overt, significant assistance of state officials" (*Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 486, 99 L. Ed. 2d 565, 576, 108 S. Ct. 1340, 1345 (1988)), so that sufficient state action exists here to invoke the protections of due process. See also F. Alexander, *Tax Liens, Tax Sales and Due Process*, 75 Ind. L.J. 747, 764 n.102 (2000).

The circuit court below rejected the argument that *Covey* controlled here. The court held that even if Apex should have known that Lowe was hospitalized, this did not mean that Apex should have known of Lowe's mental illness. As the court explained, there are many reasons for which an individual may be hospitalized that have nothing to do with mental illness. We do not disagree with the circuit court's reasoning. However, we conclude that there is a more fundamental difficulty with the public guardian's argument, namely, the fact that the argument rests on the assertion that Apex did not conduct a diligent inquiry into ascertaining Mary Lowe's whereabouts.

Section 22—15 of the Property Tax Code (35 ILCS 200/22—15 (West 1994)) requires the tax purchaser to make a "diligent inquiry" to locate the property owner and interested parties when attempting to serve the section 22—10 take notice. This "diligent inquiry" is also a constitutional requirement. See *Mennonite*, 462 U.S. at 798 n.4, 77 L. Ed. 2d at 187 n.4, 103 S. Ct. at 2711 n.4 (due process requires that "reasonably diligent efforts" be made to locate the party to whom notice is being served); *Tulsa*, 485 U.S. at 490, 99 L. Ed. 2d at 578, 108 S. Ct. at 1347 (same). In this case, when the circuit court entered the tax deed order in May of 1996, it held that Apex had made a diligent inquiry to locate Mary Lowe, thereby satisfying statutory and constitutional requirements.

In arguing that *Covey* controls here, the public guardian is attempting to relitigate the circuit court's diligent inquiry finding. The public guardian's contention is that Apex was not diligent in searching for Mary Lowe, and that if it had been, it would have learned that Lowe was hospitalized and suffering from mental illness. However, the circuit court's diligent-inquiry finding may not be challenged in a section 2—1401 petition, other than for

the reasons given in section 22—45 of the Property Tax Code (35 ILCS 200/22—45 (West 1994)). And, as previously discussed, we have concluded that the only ground under section 22—45 that is relevant here, *i.e.*, fraud or deception (see 35 ILCS 200/22—45(3) (West 1994)), has not been proven.

To hold in this case that the public guardian may reopen the circuit court's diligent-inquiry finding would run counter to the principles of finality for tax deed orders that have existed, and been approved by this court, since at least 1958. See *Southmoor Bank & Trust Co. v. Willis*, 15 Ill. 2d 388, 396 (1958) (unless a lack of jurisdiction affirmatively appears on the record, the prior findings of the court of compliance with all the provisions of law entitling the tax purchaser to a tax deed cannot be disputed in a collateral proceeding). We decline to so hold. Accordingly, we do not further consider the public guardian's argument that the present case falls under *Covey* because Apex failed to conduct a diligent inquiry to locate Mary Lowe.

The public guardian raises an additional constitutional argument that does not require reexamination of the circuit court's diligent inquiry finding. The public guardian contends that the Property Tax Code is unconstitutional as applied to all individuals, such as Mary Lowe, who are hospitalized with a disabling mental illness during the section 22—10 notice period, regardless of whether the tax purchaser has knowledge of the mental illness. According to the public guardian, the notice procedures for the section 22—10 take notice are unconstitutional because, even if the notice is actually received by the mentally disabled person, it will not be effective, *i.e.*, the person will not be able to understand or act upon it. As the public guardian states, "even if [Mary Lowe] had been served the notice [it] would have been meaningless to her due to her cognitive impairments."

This is not the proper test for assessing the constitutionality of a notice procedure. In determining whether a notice procedure is constitutional, the question is not whether the procedure actually succeeds in notifying the individual but, rather, whether the procedure is reasonably calculated to do so. As the United States Supreme Court has stated, "[The *Mullane* standard] does not say that the State *must provide* actual notice, but that it *must attempt to provide* actual notice." (Emphases in original.) *Dusenbery v. United States*, 534 U.S. 161, 170, 151 L. Ed. 2d 597, 606, 122 S. Ct. 694, 701 (2002). See also *Karkoukli's, Inc. v. Dohany*, 409 F.3d 279, 284 (6th Cir. 2005); *Baker v. Latham Sparrowbush Associates*, 72 F.3d 246 (2d Cir. 1995); 16B Am. Jur. 2d *Constitutional Law* § 937 (1998) ("If a party employs a procedure reasonably calculated to achieve notice, a successful achievement is not necessary to satisfy due process requirements"). This point—that a notice procedure need not actually succeed in providing notice to satisfy due process concerns—was noted in *Mullane*:

"This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Mullane*, 339 U.S. at 317, 94 L. Ed. at 875, 70 S. Ct. at 658.

Moreover, contrary to the public guardian's argument, whether the tax purchaser has knowledge of the delinquent taxpayer's mental illness is a factor that cannot be excluded from the due process analysis. *Mullane* holds that "all the circumstances" (*Mullane*, 339 U.S. at 314, 94 L. Ed. at 873, 70 S. Ct. at 657) of a case must be considered in analyzing the reasonableness of any notice procedure. See also *Mennonite*, 462 U.S. at 799, 77 L. Ed. 2d at 188, 103 S. Ct. at 2712 (describing *Covey*'s holding

.

that the state must make additional efforts to provide notice to a mentally incompetent individual as resting on the fact that the state was "aware of [the] party's" incompetence).

In addition, the Supreme Court has expressly held that the notifying party's knowledge of the location and status of the person to be notified conditions the level of notice that must be provided. See *Mennonite*, 462 U.S. at 800, 77 L. Ed. 2d at 188, 103 S. Ct. at 2712 ("[n]otice by mail or other means as certain to ensure actual notice" is required only if the party's whereabouts are "reasonably ascertainable"); *Tulsa*, 485 U.S. at 490-91, 99 L. Ed. 2d at 578-79, 108 S. Ct. at 1347-48 (an executor of an estate must provide notice by mail or other means as certain to ensure actual notice to a creditor, but only if the creditor's "identity as a creditor was known or reasonably ascertainable," otherwise, publication notice can suffice).

In light of the foregoing, we conclude that, in considering the constitutionality of the notice procedures set forth in sections 22—10 through 22—25 of the Property Tax Code as applied to those who are hospitalized for mental illness, the relevant question is not whether those procedures ultimately succeed in providing actual notice. Rather, the relevant question is whether the procedures require the tax purchaser to make "reasonably diligent efforts" (*Mennonite*, 462 U.S. at 798 n.4, 77 L. Ed. 2d at 187 n.4, 103 S. Ct. at 2711 n.4; *Tulsa*, 485 U.S. at 490, 99 L. Ed. 2d at 578, 108 S. Ct. at 1347) to locate and identify the hospitalized individual as a mentally disabled person entitled to the protections discussed in *Covey*.

The Property Tax Code does not include procedures that are addressed specifically to those individuals who are hospitalized for mental illness. Nothing in the Property Tax Code, for example, requires tax purchasers

to contact mental-health facilities or other hospitals and ask whether the delinquent taxpayer is a patient. Such a procedure would correct the problem that is present in this case. If the hospital told the tax purchaser that the taxpayer was, in fact, a patient and had been admitted with a mental illness, the tax purchaser would be on notice of the taxpayer's incompetence and *Covey* would apply.

However, such a procedure would also be illegal under Illinois law. Section 3(a) of the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/3(a) (West 2000)) states: "(a) All records and communications shall be confidential and shall not be disclosed except as provided in this Act." "Communications" include "information which indicates that a person is a recipient [of mental-health services]." 740 ILCS 110/2 (West 2000). Any person who knowingly and willfully discloses confidential communications is guilty of a Class A misdemeanor. 740 ILCS 110/16 (West 2000). Nothing in the Mental Health and Developmental Disabilities Confidentiality Act permits hospitals to disclose the fact that an individual is a recipient of mental-health services to tax purchasers.[8]

The public guardian does not suggest that the privacy protections afforded the mentally ill in the Mental Health and Developmental Disabilities Confidentiality Act are unconstitutional or that they can in any way be altered by this court. Nor has the public guardian identified any other procedure, in addition to the diligent inquiry requirement already found in the Property Tax Code, which would enable the tax purchaser to learn that the delinquent taxpayer is hospitalized and suffering from mental illness. Thus, the notice procedures in the Property Tax Code embody all that can be done under

---

[8]In the case at bar, Mary Lowe's medical records were obtained only after the circuit court issued a subpoena.

existing law to locate and identify a delinquent taxpayer who is hospitalized for mental illness.

The public guardian cites to three decisions from other jurisdictions in support of its argument the Property Tax Code is unconstitutional as applied to those who are hospitalized for mental illness. See *In re Consolidated Return of the Tax Claim Bureau*, 461 A.2d 1329 (Pa. Commw. 1983); *Blum v. Stone*, 127 A.D.2d 549, 511 N.Y.S.2d 638 (1987); *Vance v. Federal National Mortgage Ass'n*, 988 P.2d 1275 (Okla. 1999). The appellate court distinguished these cases on their facts. To the extent that they are not factually distinguishable, and support the public guardian's position in this case, we conclude that these decisions are not persuasive. The decisions commit the same error that the public guardian does, *i.e.*, they conclude that due process requires actual notification, rather than reasonable notice procedures. Further, none of these cases address the privacy rights of the mentally ill nor do they identify what procedures could be put into place to correct the problem of notifying individuals who are hospitalized with mental illness.

"The most important criterion in the area of procedural due process is 'reasonableness.' " *Rosewell*, 99 Ill. 2d at 412. Because the notice procedures involving the section 22—10 take notice encompass all that can be done to locate and identify the hospitalized, mentally ill taxpayer, by definition, those procedures are reasonable. Accordingly, we hold that, as applied to those taxpayers who are hospitalized for mental illness, sections 22—10 through 22—25 of the Property Tax Code meet the requirements of due process.

Finally, we note that the circuit court below, in issuing its ruling, discussed the privacy implications of this case in some detail. The court noted that it is the public policy of Illinois to protect the privacy rights of the

mentally ill but that such protection can, as in this case, have unintended consequences that actually work against the interests of the mentally ill. The court went on to suggest that, when a patient is hospitalized for mental illness and no family member or guardian is available, the legislature might consider allowing the hospital to notify the county collector, under seal, of the patient's situation, so that any time periods relating to the payment of taxes could be tolled. We express no opinion on the wisdom of this suggestion. However, we join in the circuit court's conclusion that the issues raised in this case merit legislative attention.

### CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE KARMEIER took no part in the consideration or decision of this case.